UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| STACIE M. NANCE,<br>(Social Security No. XXX-XX-3201),<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE, Commissioner<br>of the Social Security Administration,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)      3:10-cv-140-WGH-RLY<br>)<br>)<br>)<br>)<br>)<br>) |


## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 7,

9) and an Order of Reference entered by Chief Judge Richard L. Young on

February 9, 2011 (Docket No. 16).


### I.  Statement of the Case

Plaintiff, Stacie M. Nance, seeks judicial review of the final decision of the

agency, which found her not disabled and, therefore, not entitled to Disability

Insurance Benefits ("DIB") under the Social Security Act ("the Act").  42 U.S.C. §§

416(i), 423(d); 20 C.F.R. § 404.1520(f).  The court has jurisdiction over this

action pursuant to 42 U.S.C. § 405(g).

Plaintiff filed an application for DIB on February 5, 2009, alleging a

disability onset date of January 1, 2007.  (R. 109-15).  The agency denied

Plaintiff's application both initially and on reconsideration.  (R. 79-82, 87-89).

Plaintiff appeared and testified at a hearing before Administrative Law Judge Michael Scurry ("ALJ") on October 23, 2009.  (R. 36-76).  Plaintiff was represented by an attorney; also testifying was a vocational expert ("VE").  (R. 36).  On November 5, 2009, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy.  (R. 14-24).  The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner.  (R. 1-3).  20 C.F.R. §§ 404.955(a), 404.981.  Plaintiff then filed a Complaint on September 7, 2010, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Born on January 17, 1971, Plaintiff was 38 years old at the time of the ALJ's decision, with some college education.  (R. 22, 41).  Her past relevant work experience included work as a childcare provider (medium, unskilled) and a radiographic technician (light, skilled).  (R. 22).

### B.  Medical Evidence[1]

#### 1.  Plaintiff's Impairments

On February 1, 2007, Plaintiff presented to R. Michelle Galen, M.D.,  a primary care physician, for an annual physical.  (R. 245-46).  Plaintiff reported

---

[1]Plaintiff only challenges the ALJ's findings concerning her mental impairments. Therefore, the court need not list Plaintiff's medical records concerning any physical impairments, as those records are irrelevant to the issues presented by Plaintiff.

that she had gained some weight, which she attributed to going through a divorce; however, she stated that she was now eating a healthier diet. (R. 245). Plaintiff stated that she was now remarried and was happier. (R. 245). She reported that she was planning on becoming pregnant. (R. 245). Following an examination, Dr. Galen noted that Plaintiff was alert and oriented and did not display any signs of unusual anxiety or depression. (R. 246).

On April 13, 2007, one of Plaintiff's physicians noted that Plaintiff had become pregnant. (R. 249). In November 2007, Plaintiff gave birth to her daughter. (R. 257).

On January 15, 2008, Brent E. Cochran, M.D., who is the pediatrician for Plaintiff's two children, wrote a letter detailing Plaintiff's mental health. (R. 243). Dr. Cochran indicated that Plaintiff had problems with organization and completion of tasks which interfered with Plaintiff's ability to be employed. He noted Plaintiff's report that she had attention deficit disorder ("ADD"). He opined that Plaintiff could not work in her current condition, but he had a good prognosis for a full return to work with appropriate treatment and therapy. (R. 243).

On February 14, 2008, Dr. Galen saw Plaintiff for complaints of fatigue. (R. 257-60). Dr. Galen noted that Plaintiff was alert and oriented with an intact memory and did not display any signs of unusual anxiety or evidence of depression upon examination. (R. 259).

On March 5, 2008, Plaintiff presented to Dr. Galen with complaints of having difficulty sleeping and having some problems with her "mind racing"

while she was taking care of her baby. (R. 262-64). Plaintiff reported that she had difficulty completing tasks since childhood. (R. 262). Plaintiff reported that she was anxious and had some difficulties with concentration, emotional distress, and sleep disturbances. (R. 262). Dr. Galen noted that Plaintiff had no prior psychiatric hospitalizations, and she had no suicidal ideation. (R. 262). Upon examination, Dr. Galen reported that Plaintiff was anxious, but she was not depressed. (R. 263). Dr. Galen noted that Plaintiff did not display any signs of suicidal ideation, fearfulness, hopelessness, mood swings, feelings of agitation, compulsive behaviors, obsessive thoughts, hallucinations, paranoia, forgetfulness, or memory loss. (R. 263). Dr. Galen further noted that Plaintiff was alert and oriented, that Plaintiff's insight and judgment were normal, and that she had no pressured speech. (R. 263). Dr. Galen diagnosed Plaintiff with anxiety disorder, general; recommended that she begin taking Zoloft to treat her anxiety symptoms; recommended that Plaintiff get better sleep (although she did have an infant); and recommended psychological testing. (R. 263).

On April 10, 2008, Plaintiff had a follow-up exam with Dr. Galen concerning her anxiety. (R. 265-66). Plaintiff noted that it had been somewhat difficult to meet her home, work, or social obligations due to her anxiety. (R. 265). Plaintiff reported that she was experiencing anxiety, fearful thoughts, compulsive thoughts or behaviors, fatigue or loss of energy, poor concentration, indecisiveness, restlessness, and sleep disturbance. (R. 265). Plaintiff denied having any irritable mood, diminished interest or pleasure, feelings of guilt or worthlessness, hallucinations, manic episodes, panic attacks, memory loss,

significant change in appetite, or thoughts of death or suicide. (R. 265-66). Upon examination, Dr. Galen noted that Plaintiff was alert and oriented, had normal insight and judgment, was not anxious or depressed, and was having no memory loss. (R. 266). Dr. Galen recommended that Plaintiff increase her dosage of Zoloft and follow up with a psychologist for psychological therapy sessions. (R. 266). She also referred Plaintiff to Juan C. Cabrera, Jr., Ph.D., for further management. (R. 266).

On May 12, 2008, Dr. Cabrera, conducted an initial psychiatric assessment. (R. 291-92). Plaintiff reported that she had a racing mind and complained of insomnia. (R. 291). Plaintiff came into Dr. Cabrera's office holding a brochure for ADD and stating she thought that was her problem. (R. 291). Plaintiff stated that she thought she had ADD her entire life. (R. 291). She reported that she would always get in trouble at school by talking in class, being the class clown, and being impulsive. (R. 291). Plaintiff stated that she had been fired from numerous jobs because she was forgetful or not following procedure; she was also disorganized at home. (R. 291). Dr. Cabrera reported that answers to a questionnaire revealed some symptoms of depression including occasionally feeling depressed, having loss of interest, only sleeping five hours per night, some mild hopelessness, some change in appetite, decreased energy, and problems with memory and concentration. (R. 291). Dr. Cabrera also noted that Plaintiff reported some anxiety, but that it was rather non-descriptive. (R. 291). Plaintiff reported that she was currently working for the YMCA watching children, and she previously taught water aerobics; she also

had two children: a seven-month-old and a seven-year-old. (R. 291). Upon examination, Dr. Cabrera noted that Plaintiff was neatly groomed, alert, and oriented to person, place, and time, with good eye contact and no abnormal movements. (R. 291-92). Dr. Cabrera reported that Plaintiff was euthymic to bright in affect and that her thought processes were pertinent and sequential. (R. 291). Dr. Cabrera noted that Plaintiff was rather talkative, although she seemed somewhat scattered and forgot some of the questions that she had for him that day. (R. 292). He also reported that Plaintiff's memory, insight, and judgment were intact. (R. 292). Based on his examination, Dr. Cabrera diagnosed Plaintiff with depressive disorder, NOS, and possible attention-deficit hyperactivity disorder ("ADHD"). (R. 292). He assigned a Global Assessment of Functioning ("GAF") score of 70. Dr. Cabrera recommended that Plaintiff continue taking Zoloft and undergo psychological testing to evaluate her possible ADHD diagnosis. (R. 292).

On June 13, 2008, Gregory E. Goffinet, Psy.D., conducted a psychological evaluation of Plaintiff's possible ADHD diagnosis. (R. 324-27). Dr. Goffinet reported that Plaintiff had endorsed some symptoms of ADHD, including forgetfulness, difficulty organizing self, losing things, and failure to finish work. (R. 324). During the consultation, Plaintiff stated that her depression comes and goes depending on her frustrations. (R. 324). She reported that she was sometimes irritable and argumentative with her spouse, that he did not understand how she could not keep the house clean, and that she watched television and could not get away from it. (R. 324). Based on his examination,

Dr. Goffinet reported that Plaintiff's cognitive functioning was within normal limits; that behavioral observations revealed no significant findings; and that her affect was appropriate and consistent with expressed ideation. (R. 325). Dr. Goffinet indicated that there was no evidence of any formal thought disorder, and Plaintiff had denied experiencing any hallucinations or delusions. (R. 325). Dr. Goffinet noted that Plaintiff had self-reported symptoms of ADHD, including inattention and impulsivity, and she had some performance difficulties on various diagnostic tests. (R. 326). Dr. Goffinet reported that Plaintiff's difficulties appeared to be with organizing material, multitasking, attention, and sustained attention. (R. 326). Dr. Goffinet noted that, during the evaluation, Plaintiff became easily frustrated and had difficulty managing her anxiety and frustration. (R. 326). Dr. Goffinet diagnosed Plaintiff with ADHD, combined type and generalized anxiety disorder. (R. 326). He assigned a GAF score of 65 and recommended that she undergo therapy to manage ADHD and anxiety. (R. 326-27).

Notes from Dr. Cabrera on June 24, 2008, indicate that Plaintiff stopped taking her Zoloft against his orders. He attributed this impulsive behavior to Plaintiff's ADHD and instructed her to call before ever discontinuing medication. (R. 293).

On July 2, 2008, Plaintiff presented to Dr. Cabrera with complaints of irritability, panic, and trouble focusing. (R. 293). Dr. Cabrera stated that he suspected that Plaintiff's symptoms were due to the fact that she had discontinued taking Zoloft, her antidepressant medication. (R. 293). Dr.

Cabrera advised Plaintiff to restart Zoloft and to attend psychological therapy sessions. (R. 293).

On August 28, 2008, Plaintiff reported to Dr. Cabrera that the Adderall had been helpful and that she was now better organized. (R. 296). She indicated that her husband was pleased with her improvement. (R. 296). Plaintiff reported that she had improved memory and less misplacing of items. (R. 296). Plaintiff did indicate that she continued to have anxiety, especially when she was under pressure. Plaintiff also reported that she had competed in a triathalon since her last appointment and had finished twentieth in her age group. (R. 296). Dr. Cabrera noted that Plaintiff's mood was euthymic and that she displayed increased humor. (R. 296).

On September 25, 2008, Plaintiff reported to Dr. Cabrera that she still got anxious and still worried at times, but that her condition had improved. (R. 296). Plaintiff stated that she thought that her Adderall had quit working. (R. 296). Dr. Cabrera recommended that Plaintiff take an increased dosage of Adderall. (R. 297). Plaintiff also reported that she was currently training for a half marathon in October. (R. 296). Dr. Cabrera noted that Plaintiff was alert and spontaneous during the examination, and she got excited when speaking about her problems at work. (R. 297).

On October 1, 2008, Plaintiff complained that she had trouble remembering to take her second dose of Adderall. (R. 297).

On October 13, 2008, Plaintiff complained of having trouble sleeping because she would lay in bed and start ruminating about all of the things that

she needed to get done. (R. 297). Dr. Cabrera advised Plaintiff to change this behavior and prescribed Citalopram, an antidepressant. (R. 297-98).

On October 29, 2008, Plaintiff presented to Dr. Galen with complaints related to fatigue, insomnia, and mood disorder. (R. 272-74). Upon examination, Dr. Galen reported that Plaintiff was alert and oriented, was not anxious and not depressed. (R. 273). She further noted that Plaintiff did not have suicidal ideation, was not fearful, denied hopelessness, exhibited no compulsive behaviors, had no obsessive thoughts, was not forgetful, and was not having memory loss. (R. 273). Dr. Galen noted that Plaintiff had failed to follow up with a therapist for treatment of her anxiety disorder, as previously recommended. (R. 274). Dr. Galen discussed the importance of Plaintiff meeting with a therapist in order to treat her anxiety condition and indicated that, if Plaintiff's noncompliance continued, she would meet the criteria for termination. (R. 274).

On October 30, 2008, Plaintiff reported that she had abruptly stopped taking her Citalopram and was not taking the recommended dosage of Adderall. (R. 298). Plaintiff told Dr. Cabrera that she had not been taking her medications consistently. (R. 298). Plaintiff reported feeling dizzy at work. Plaintiff complained that her insurance was going to be changing. Dr. Cabrera prescribed Remeron to treat her general anxiety disorder. (R. 298).

On November 26, 2008, Plaintiff reported that she continued to forget to take her second dose of Adderall. (R. 299). She reported feeling like a zombie in the morning and staying up until 2:00 a.m., trying to get things done. Dr.

Cabrera stressed the importance of time management and improving her sleep schedule. (R. 299). Plaintiff's husband told Dr. Cabrera that Plaintiff had been better on Vyvanse, a medication Plaintiff had previously used to treat ADHD, and that this drug was approved for their insurance. (R. 299). Dr. Cabrera recommended that Plaintiff discontinue Adderall and restart Vyvanse. (R. 299).

On December 19, 2008, Plaintiff presented to the office of Melissa Reisinger, M.D., her treating obstetrician and gynecologist, requesting Ativan or Xanax for her anxiety. (R. 284). Plaintiff reported that she was feeling overwhelmed trying to take care of her infant daughter. (R. 284). Plaintiff was agitated and had difficulty being focused. Plaintiff had just come from Dr. Cabrera's office where she had requested Ativan; however, Dr. Cabrera's office refused to issue a prescription for that medication. (R. 284). Plaintiff reported that she had stopped some of the medication Dr. Cabrera had prescribed and that she did not believe the other medication was working. (R. 284). Dr. Reisinger's office informed Plaintiff that she was unable to prescribe her Ativan or Xanax at that time. (R. 284). It was recommended that Plaintiff go to the emergency room, but Plaintiff declined, stating that she did not have the money. (R. 284).

On December 22, 2008, Plaintiff presented to Dr. Cabrera with complaints of having more anxiety attacks. (R. 299). Plaintiff stated that she was no longer having any difficulties sleeping. (R. 299-300). Plaintiff stated that she had decided to quit taking her Remeron because she was sleeping so well. (R. 300). Dr. Cabrera advised Plaintiff that she needed to take Remeron for her anxiety

symptoms. (R. 300). He also prescribed Klonopin and again encouraged her to attend mental health therapy. (R. 300).

In January 2009, Plaintiff began undergoing counseling with Linda Evers, a social worker, for her anxiety, anger, and history of ADHD. (R. 372-74).

On January 21, 2009, Plaintiff again saw Dr. Reisinger with complaints of worsening anxiety and depression. (R. 282-83). Dr. Reisinger indicated that Plaintiff was having difficulty focusing and demonstrated flight of ideas. (R. 282). Plaintiff reported that she was seeing a therapist irregularly due to cost concerns. She explained that she had lost several jobs due to inability to control her temper or forgetfulness. (R. 282). Dr. Reisinger refused to add any new medications. (R. 283).

On January 22, 2009, Plaintiff reported that she had recently spent $1,400 on her daughter's bedroom set. (R. 301). At that time, Dr. Cabrera indicated that it was possible that Plaintiff had bipolar disorder. (R. 301). Dr. Cabrera recommended that Plaintiff discontinue taking Vyvanse and Remeron and begin taking Depakote. (R. 301).

On January 26, 2009, Plaintiff presented to Doris Best, M.D., a family practice physician, with complaints of having difficulty concentrating and having problems with her temper. (R. 391-92). Dr. Best noted that Plaintiff was mad at Dr. Cabrera, her psychiatrist, because he had accused her of being a drug seeker. (R. 391). Upon examination, Dr. Best noted that Plaintiff was anxious, tearful, and sad with flight of speech and thought patterns. (R. 391). Dr. Best diagnosed Plaintiff with bipolar disorder, NOS. (R. 392).

On February 2, 2009, Plaintiff told Dr. Cabrera that she had not experienced any improvement with Depakote; she was still irritable. (R. 301). She reported that she had been taking more Klonopin than prescribed. (R. 301). Dr. Cabrera advised Plaintiff that excessive use of Klonopin can cause fatigue and problems with memory. (R. 301). Dr. Cabrera noted that Plaintiff was not using the techniques she had been taught for coping with anxiety. (R. 301).

On February 11, 2009, Plaintiff reported that Child Protective Services had come to her home based on a comment she had made at the welfare office; she did not know what the inappropriate comment was. (R. 302). Dr. Cabrera added Abilify to Plaintiff's medication regimen. (R. 303). Plaintiff subsequently reported on February 18, 2009, that her condition had improved with Abilify and that her moods had been more stable. (R. 303). Dr. Cabrera noted that Plaintiff was alert; that her speech and tone were appropriate; and that her mood was euthymic. (R. 303).

On February 26, 2009, Plaintiff visited Dr. Best. (R. 393-94). She indicated that she was confused because she felt like she was getting worse while other doctors were telling her that she was getting better. (R. 393). Dr. Best prescribed lithium to treat Plaintiff's bipolar disorder. (R. 394).

On March 18, 2009, Plaintiff told Dr. Best that she had started a new job at American Freight, and she was doing well there. (R. 400-01). Plaintiff requested that she be increased to two lithium; she said that she still fights with her husband, who said that she needed just a little more lithium. (R. 400). It is noteworthy that on March 5, Plaintiff had reported to Dr. Best that she had

taken three lithium instead of her prescribed dose of one, and Dr. Best had counseled her on the prescribed dosage. (R. 396-97). Dr. Best did increase Plaintiff's lithium dosage. (R. 401).

On March 26, 2009, Plaintiff stated that she seemed to be doing okay at that time. (R. 402-03). She loved her new job. (R. 402). She requested less frequent follow-up appointments with Dr. Best. (R. 402).

On April 16, 2009, Jessica Huett, Psy.D., conducted a consultative psychological examination of Plaintiff. (R. 333-35). Plaintiff reported that her chief complaints were ADHD, depression, anxiety, and bipolar disorder. (R. 333). She indicated that she was currently seeing a counselor and that money problems had interfered with her ability to seek treatment. (R. 333). Plaintiff reported that she had pretty good sleep habits with medication, and she was able to manage self-care tasks, but not always daily. (R. 334). Plaintiff reported that she was not good at performing household chores and provided the examiner with several pictures of her house. (R. 334). Dr. Huett noted that, although the pictures showed rooms that were somewhat cluttered, the pictures did not appear to be as bad as what Plaintiff seemed to think they displayed. (R. 334). Dr. Huett reported that Plaintiff's pictures essentially depicted some clothes piled next to a dresser in her bedroom and a countertop in her kitchen that had several dishes and things on it. (R. 334). Plaintiff reported that she did not like to go shopping, is overwhelmed at stores, and had a history of impulsive spending. (R. 334). Plaintiff stated that, during the day, she typically watched television and tried to take care of her baby. (R. 334). Plaintiff reported that she

had trouble completing tasks, staying focused, and worrying. (R. 334). Upon mental status examination, Dr. Huett reported that Plaintiff was quite anxious, and her lips appeared to be trembling at times due to apparent anxiety. (R. 334). Dr. Huett indicated that Plaintiff's attention was distractible, and her concentration was quite scattered. (R. 334). Dr. Huett noted that Plaintiff's memory capacity appeared normal. (R. 334). She reported that Plaintiff's affect was restricted and mood was pessimistic. (R. 334). Dr. Huett indicated that Plaintiff was capable of normal decision making, and her judgment was adequate. (R. 335). She noted that Plaintiff had some deficits in insight, interpersonal relations, and coping ability. (R. 335). Based on her psychological examination, Dr. Huett diagnosed Plaintiff with generalized anxiety disorder; ADHD, by history; and mood disorder, NOS. (R. 335). Dr. Huett assigned a GAF score of 51. Dr. Huett indicated that anxiety appeared to be Plaintiff's primary issue, and she had moderate impairment in functioning due to mental health issues. (R. 335). She indicated that bipolar disorder could not be totally ruled out, but Plaintiff only had an elevated mood of one day. (R. 335). Dr. Huett noted that Plaintiff had reported impulsive spending and shoplifting behavior; thus, she stated that Plaintiff could not manage benefits adequately in her own best interest. (R. 335). Dr. Huett stated that Plaintiff's prognosis for improvement was fair with appropriate mental health intervention. (R. 335).

On April 20, 2009, Plaintiff told Dr. Best that she wanted to continue taking lithium because she and her husband felt she was doing better than she had in a long time. (R. 409-10). Plaintiff reported that she still had some

problems "going off" on people. (R. 409). Dr. Best noted that Plaintiff was laughing, calm, and collected, and she was not emotional at that time. (R. 409). Dr. Best reported that Plaintiff's mood was happy. (R. 409). Dr. Best indicated that Plaintiff's anxiety disorder and depression were well-controlled, and her bipolar disorder was stabilizing and/or improving. (R. 409).

On September 9, 2009, Linda Evers, a social worker, completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) form. (R. 383-87). Evers checked boxes to indicate that Plaintiff had either marked or extreme functional limitations in all areas of mental functioning. (R. 384-86).

On September 21, 2009, Dr. Best completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) form. (R. 458-62). Dr. Best opined that Plaintiff had marked restriction in her ability to understand, remember, and carry out detailed instructions, but had only slight restriction in her ability to understand, remember, and carry out simple instructions. (R. 459). Dr. Best opined that Plaintiff had marked restriction in her ability to make judgments in simple work-related decisions; to maintain attention and concentration; to interact appropriately with co-workers; to respond appropriately to work pressures and changes in a routine work setting; to remember locations and workday procedures and instructions; and to behave predictably, reliably and in an emotionally stable manner. (R. 459-60). She opined that Plaintiff had moderate restriction in her ability to perform and complete work tasks at a consistent pace and to interact appropriately with the public. (R. 459-60). She also opined that Plaintiff had slight restriction in her

ability to care for herself and to tolerate low stress work on a sustained basis. (R. 459-60).

## 2. State Agency Review

In May 2009, J. Gange, Ph.D., a state agency reviewing psychologist, completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment. (R. 336-52). Dr. Gange opined that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 350). Dr. Gange opined that, while Plaintiff may have difficulty with more complex tasks, she retained the ability to perform and complete tasks without special considerations or accommodations. (R. 338). He noted that Plaintiff was able to care for her hygiene on a daily basis, to cook, and to do laundry and other household tasks. (R. 338). He further noted that Plaintiff was able to keep up with her appointments, provide adult supervision, care for her two children, go out alone in public, go shopping at the store, spend time with family, and watch television. (R. 338). F. Kladder, Ph.D., another state agency reviewing psychologist, affirmed Dr. Gange's opinion in July 2009. (R. 378).

## III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v.*

*Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his/her past relevant work; and (5) is unable to perform any other work existing in significant

numbers in the national economy.  *Id.*  The burden of proof is on Plaintiff during
steps one through four, and only after Plaintiff has reached step five does the
burden shift to the Commissioner.  *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir.
2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through June 30,
2013; Plaintiff also had not engaged in substantial gainful activity since the
alleged onset date.  (R. 16).  The ALJ found that, in accordance with 20 C.F.R. §
404.1520, Plaintiff had five impairments that are classified as severe:  (1)
attention deficit hyperactivity disorder, combined type; (2) general anxiety
disorder; (3) bipolar disorder, NOS; (4) mood disorder, NOS; and (5) migraines.
(R. 16).  The ALJ concluded that these impairments did not meet or substantially
equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R.
16).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent
of her limitations were not fully credible.  (R. 18-22).  Consequently, the ALJ
concluded that Plaintiff retained the RFC to perform medium work with the
following limitations:  occasionally balancing, kneeling, crawling, and climbing
ramps and stairs; frequently stooping/crouching; never climbing ladders, ropes,
or scaffolds.  Plaintiff can also understand and remember short, simple
instructions; can carry out short, simple instructions with reasonable
concentration, persistence, and pace for such work; and can tolerate brief
superficial contact with the public/co-workers/supervisors.  (R. 17).  The ALJ
opined that Plaintiff did not retain the RFC to perform her past work.  (R. 22).

However, Plaintiff retained the RFC to perform a significant number of jobs in the regional economy, including line worker (2,500 jobs), equipment cleaner (2,000 jobs), and kitchen helper (3,000 jobs). (R. 23). The ALJ concluded by finding that Plaintiff was not under a disability. (R. 23).

## VI.  Issues

Plaintiff has essentially raised three issues.  The issues are as follows:

1.  Whether the ALJ mischaracterized Dr. Huett's findings.

2.  Whether the ALJ gave improper weight to various opinions.

3.  Whether the ALJ asked a flawed hypothetical to the VE.

**Issue 1:  Whether the ALJ mischaracterized Dr. Huett's findings.**

Plaintiff first argues that the ALJ erred by not properly analyzing Dr. Huett's findings.  The ALJ's decision does address Dr. Huett's consultative examination of Plaintiff.  (R. 22).  The ALJ acknowledged that Dr. Huett found greater limitations than either Dr. Cabrera or Dr. Goffinet.  However, the ALJ concluded that Dr. Huett had assigned a GAF score of 51, which indicated moderate symptoms, and Dr. Huett had opined that Plaintiff's prognosis was fair with appropriate mental health intervention.  (R. 22).  The ALJ determined that Dr. Huett's findings did not support a finding of disability, and he gave her opinions, along with those of Dr. Cabrera and Dr. Goffinet, great weight.  (R. 22). There was nothing improper about this decision.  The medical records reveal Dr. Huett opined that Plaintiff had moderate limitations.  (R. 335).  Dr. Huett, in fact, found that Plaintiff displayed normal memory, was capable of normal decision making, and displayed adequate judgment.  (R. 334).  Dr. Huett did find

deficits in Plaintiff's concentration due to anxiety, but only opined that this moderately limited Plaintiff. (R. 335). Nothing in Dr. Huett's findings supports a finding of greater limitations than those found by the ALJ.

**Issue 2: Whether the ALJ gave improper weight to various opinions.**

Next, Plaintiff argues that the ALJ relied too heavily on the opinions of Dr. Gange, a state agency physician, while not giving enough weight to the opinions of Plaintiff's treating physician, Dr. Best, or to Plaintiff's therapist, Linda Evers. Opinions of a treating physician are generally entitled to controlling weight. *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000). However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001). Additionally, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> > (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of

your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i)  Length of the treatment relationship and the frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii)  Nature and extent of the treatment relationship.  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more

weight than we would give it if it were from a nontreating source.

(3)  Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4)  Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5)  Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6)  Other factors.  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 404.1527.

In this case, contrary to Plaintiff's assertions, the ALJ did not rely too heavily on the opinions of the state agency reviewing psychologist, Dr. Gange.

Instead, the ALJ concluded that the opinions of Plaintiff's treating psychologist, Dr. Cabrera, as well as the opinions provided by consultative examiners, Dr. Goffinet and Dr. Huett, together with the opinions of Dr. Gange, supported a finding that Plaintiff was not disabled. The ALJ was clearly warranted in making this determination.[2] The examinations by Dr. Goffinet, Dr. Huett, and Dr. Cabrera generally revealed mild to moderate impairments in Plaintiff's mental health. (R. 291-92, 324-27, 333-35).[3] Dr. Gange simply relied on these findings and translated them to a finding that Plaintiff suffered mild limitation in activities of daily living; mild limitation in social functioning; and moderate limitation in concentration, persistence, or pace. (R. 350). There was nothing improper about this determination.

Plaintiff also argues that the ALJ improperly relied too heavily on Plaintiff's activities of daily living to "corroborate Dr. Gange's opinion with the record." (Plaintiff's Brief in Support of Judicial Review at 4). An examination of the ALJ's

---

[2]As an initial matter, it is important to remember that Plaintiff alleges she became unable to work on January 1, 2007. However, there is absolutely no medical evidence to suggest that Plaintiff had a severe mental impairment prior to March 2008 when Dr. Galen diagnosed an anxiety disorder. (R. 263). Prior to that date, Plaintiff had been seen by Dr. Galen in February 2007 and February 2008, and Dr. Galen had noted essentially normal psychological results. (R. 245-46, 257-60). Therefore, there was no evidence that Plaintiff even suffered a severe impairment prior to March 2008.

[3]It is true that there were individual visits in the time span from March 2008 to April 2009 in which Plaintiff's mental health was worse. However, the record during this time is replete with instances where Plaintiff was taking less (or sometimes more) medication than had been prescribed; Plaintiff on several occasions ceased taking medication altogether without prior approval from a doctor. Additionally, during a great deal of this time, Plaintiff was not seeing a therapist despite recommendations to do so.

decision reveals that Plaintiff's claim is without merit. The ALJ noted that a myriad of factors (one of which was Plaintiff's activities of daily living) weighed against a finding of disability. First, the ALJ focused on Plaintiff's noncompliance, including not attending therapy and discontinuing medication. (R. 19). Second, the ALJ examined the objective medical evidence, most of which reveals mild or sometimes moderate limitations. (R. 20-21). Third, the ALJ looked at Plaintiff's work history. The ALJ used Plaintiff's attempts to work at the YMCA and American Freight during the relevant time period (while these attempts were ultimately unsuccessful) as some evidence that Plaintiff could work.[4] (R. 20). Fourth, and finally, the ALJ looked at Plaintiff's activities of daily living. The ALJ noted that Plaintiff's husband works, so Plaintiff is the primary caregiver for two young children (age two and eight at the time of the ALJ's decision). The ALJ noted that Plaintiff cleans her house, cooks simple meals, does laundry, watches television, gets her eight-year-old up for school, helps her with copious amounts of homework, and trains for races, including half marathons and triathalons. (R. 19-20). Based on the totality of all of this evidence, the ALJ reasonably concluded that he concurred with Dr. Gange's findings.

---

[4]Noteworthy to the court is the fact that Plaintiff's three or more months of work at American Freight involved work as a salesperson on the sales floor of a furniture store. Plaintiff testified the job involved 30-40 hours of work a week. (R. 44-45). Plaintiff also had two young children at the time. This time period coincides with medical records where Plaintiff reported being in compliance with prescribed medication. (R. 400-02, 409-10).

Plaintiff argues that the ALJ also erred because he did not give enough weight to the opinions of Dr. Best and Plaintiff's therapist, Linda Evers. Both of these caregivers filled out forms in which they opined that Plaintiff suffered from either marked or extreme limitations in almost all areas of mental functioning. (R. 383-87, 458-62). However, Evers is not a doctor and, therefore, her opinions are not entitled to controlling weight. While Dr. Best was Plaintiff's treating physician, she is not a psychologist or psychiatrist. The ALJ did note these opinions, but correctly determined that they were not consistent with other objective medical testing in the record from Dr. Goffinet, Dr. Huett, and Dr. Cabrera. (R. 20-21). For these reasons, the ALJ was not obligated to adopt the findings of Evers or Dr. Best, and his decision is supported by substantial evidence.

**Issue 3: Whether the ALJ asked a flawed hypothetical to the VE.**

For the first time in her reply brief (Docket No. 20), Plaintiff argues that the ALJ asked a hypothetical question to the VE that was vague and did not incorporate all of Plaintiff's limitations. By failing to raise this issue in Plaintiff's original brief (Docket No. 13), it is arguably waived. However, in an abundance of caution, we will address that argument here. Essentially, Plaintiff is arguing that the ALJ found that Plaintiff had moderate limitations in concentration, persistence, and pace, but the ALJ did not incorporate this limitation into the hypothetical question that was asked to the VE. Instead, the ALJ asked the VE to assume an individual who can "understand and remember short, simple

instructions and can carry out short, simple instructions with reasonable concentration, persistence, and pace . . . ." (R. 69-70). In this case, Plaintiff is confusing the ALJ's task at step three of the five-step sequential evaluation process (where he determines if Plaintiff's mental impairment meets a listing) with the ALJ's task at steps four and five (where he translates the mental limitations into an actual RFC). As the ALJ explained:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(R. 17). The ALJ went on to conclude that moderate limitations in concentration, persistence, and pace translate into a limitation of only being able to understand, remember, and carry out short, simple instructions. The ALJ asked a proper hypothetical question to the VE that included this limitation. There was, therefore, nothing inappropriate about the hypothetical question posed to the VE, and the ALJ's decision is supported by substantial evidence.

## VII.  Conclusion

The ALJ did not mischaracterize Dr. Huett's opinion. The ALJ also gave appropriate weight to all of the medical opinions in the record. Finally, the ALJ

asked a proper hypothetical question to the VE. The final decision of the Commissioner is, therefore, **AFFIRMED.**

      **SO ORDERED.**

**Dated:**  June 28, 2011

                                  William G. Hussmann, Jr.
                                  United States Magistrate Judge
                                  Southern District of Indiana

**Electronic copies to:**

Lane C. Siesky
SIESKY LAW FIRM, PC
lane@sieskylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov